## 10816

### STATE v. HERRING

#### (110 S. E. 668)

1. HOMICIDE—KILLING OF WIFE'S PARAMOUR AFTER COOLING TIME MURDER.—The killing of wife's paramour is reduced to manslaughter only when the husband comes upon the pair in guilty embrace, or in a flagrantly suggestive situation, and husband who kills the paramour after there has been cooling time is guilty of murder.

2. HOMICIDE—EVIDENCE OF INCONTINENCE OF WIFE WITH OTHER THAN DECEASED HELD ADMISSIBLE ON ISSUE OF INSANITY.—Where defense was that defendant was rendered temporarily insane by incontinence of wife in respect to deceased, it was permissible for the State to show that defendant knew of wife's incontinence with other men than deceased, and had not acted promptly under the influence of an overmastering furor.

3. HOMICIDE—EVIDENCE OF SPECIFIC ACTS HELD NOT INADMISSIBLE AS REBUTTING TESTIMONY OF DEFENDANT'S REPUTATION.—In prosecution for killing alleged paramour of wife, where defendant put in evidence as to reputation for peace and good order, and even State's witness testified to his good reputation in that respect, evidence of defendant's acts in connection with prior indignities reported to defendant to have been thrust upon his wife *held* not subject to the objection that they were offered to rebut the testimony of reputation for peace and good order.

4. HOMICIDE—ADMISSION OF EVIDENCE HELD NOT PREJUDICIAL.—In homicide cese, where a number of witnesses, including some State's witnesses, testified to the defendant's reputation for peace

and good order, testimony as to specific acts of accused when hearing of indignities offered his wife, by others than deceased *held* harmless.

5. HOMICIDE—EVIDENCE OF DECLARATION OF DECEASED AS TO IMPOTENCY HELD ADMISSIBLE IN PROSECUTION FOR KILLING WIFE'S PARAMOUR.—In prosecution for killing one reported by wife to be her paramour, testimony of a physician that deceased had declared to him while under treatment that he was sexually impotent was properly admitted, especially where the disease with which deceased was afflicted attacked the citadel of that power, and several physicians so testified.

Before GARY, J., Anderson, November, 1920. Affirmed.

Houston R. Herring indicted for the killing of Clarence E. Tolley. Upon conviction of manslaughter defendant appeals.

*Messrs. A. H. Dagnall and Leon L. Rice,* for appellant, cite: *If a man's reason be dethroned he is not criminally accountable:* 39 S. C., 109; 100 S. C., 258. *Plea of not guilty carries with it all defenses:* 98 S. C., 519. *Cross examination on irrelevant matters is reversible error:* 98 S. C., 114; 100 S. C., 250. *Improper to contradict on a collateral matter:* 33 S. C., 592; 43 S. C., 205; 49 S. C., 414; 55 S. C., 32; 89 S. C., 151; 94 S. C., 458; 100 S. C., 250; 115 S. C., 333; 3 Enc. Evid., 39; 1 Wharton Crim. Ev., 243; 2 N. & McC., 515. *Statements of deceased as to physical condition inadmissible:* 56 S. C., 496.

*Messrs. L. W. Harris, Solicitor, Bonham & Allen, Bonham & Price* and *Samuel M. Wolfe, Attorney General,* for respondent: *Bonham & Allen,* cite: *Statements of party to physician as to ailments are admissible:* 10 Rich. L., 123; 65 S. C., 25.

*Mr. Wolfe* cites: *Insanity if established is complete defense:* 1 Bish. Cr. L., 396; 110 N. E., 945; 194 N. Y., 448. *Presumption of sanity:* 24 S. C., 439. *Charge sustained:* 15 S. C., 414; 89 S. C., 125; 1 Bish. Cr. L., 396; 1 Strob., 479; 87 S. C., 407; 85 S. C., 173; 30 S. C., 74; 24 S. C., 439; 90 S. C., 296.

January 25, 1922.

The opinion of the Court was delivered by Mr. Justice Cothran.

The defendant was convicted of manslaughter at November term, 1920, upon an indictment charging him with murder of Clarence R. Tolley at Anderson on September 1, 1920.

His own version of the deplorable affair, in our opinion, shows that the jury took a merciful view of his offense. He says that, having contracted a venereal disease, and knowing that it could have come in only one way, he demanded of his wife, at the point of a pistol, the name of the invader of his home; that she named the deceased; that "When my wife told me it was Mr. Tolley I told her that I was going to kill him." Tolley was in a Baltimore hospital at the time. The defendant was examined by his physician on August 26th, and when told that he was afflicted with the disease broke down crying, "and said that he was going to kill the man." Tolley returned to Anderson on August 31st. In the meantime the defendant bided his time, having expressed to at least two persons, according to his own admission and the testimony of his witness, Dr. Dean, the determined, fixed purpose to kill Tolley at the first opportunity, and, what he had never done before, armed himself and kept himself armed for that purpose. He had that opportunity on the morning of September 1st, when Tolley was in his own place of business. The studied purpose to kill is shown by the defendant's own testimony: "I remember saying that I was going to kill him"; "I would have shot him for ruining my home," whether he attempted to draw a weapon or not; "I says, 'I am going to kill you'"; "I shot him because he ruined my home." He had fearful provocation; he made up his mind to kill; he expressed the purpose to kill; he killed.

As far as the Court has gone to extenuate the homicide of a wife's paramour, is to reduce the killing from murder to manslaughter only when the husband comes upon the pair in guilty embrace, or in a flagrantly suggestive situation. When there has been cooling time sufficient for a man of ordinary control to rid himself of the overmastering passion produced by the horror and mortification of the sight, and out of revenge the offended husband hunts the paramour and kills him, it is murder. The law under no circumstances ever justifies the avenger; while, out of tender regard for the passions and frailties and intensely wounded sensibilities of human nature, it may extenuate the offense, it is still an offense: there is no justification.

What was intended to be the leading opinion finds reversible error in two particulars of admitted testimony. The first is assigned in the group of exceptions which relate to the testimony of the witness Sam Murphy; the second in the exceptions which relate to the testimony of Dr. Young.

1. As to the testimony of Murphy: It is claimed to be inadmissible and reversible error on two grounds: (a) As detailing particular acts of violence on the part of the defendant in rebuttal of testimony offered by him of his reputation for peace and good order; (b) as contradicting the defendant upon a collateral and irrelevant matter. We do not think that the testimony is subject to either objection, as we shall endeavor to show.

The defendant entered a plea of not guilty, and under it relied upon what is generally denominated the special defenses of self-defense and temporary insanity. He also put into the scales his own reputation for peace and good order. There is not a line in the testimony for the State which tends or was intended to rebut the testimony offered to establish the defendant's reputation for peace and good

order; on the contrary, two of the main witnesses for the State referred to him in terms of commendation. Robert Matthews testified that:

"Mr. Herring and Mr. Tolley were good friends, and got along together all right. Mr. Herring thought a whole lot of Mr. Tolley, and he was Mr. Tolley's right-hand man."

George M. Tolley, brother of the deceased, testified:

"Mr. Herring has worked for me about two and a half years, and I thought a lot of him. He was a good workman and faithful."

He could hardly have deserved this commendation had he been a man of turbulence and violence. His reputation in this respect was not an issue in the case, and there is nothing in the testimony of Murphy which put it in issue.

As the testimony, the charge, and the arguments show, the main line of defense was that the defendant was so outraged by information of the faithlessness of his wife and the frightful wrong of his employer, with its repulsive details, that his reason for the time being was dethroned, and his act in slaying was the result of temporary insanity, for which he should not be held responsible.

The establishment of this fact depended so much upon the suddenness of the information and the swiftness of his action that it was permissible for the State to offer in rebuttal testimony that the defendant knew of her incontinence with other men than Tolley, and had not acted promptly as he claimed under the influence of an overmastering furor. That that was the purpose of the testimony sought to be adduced from Murphy there can be no doubt. As a matter of fact, it fell very far short of the purpose, but the whole setting of the trial shows that that was the object of the State, that it was so understood by the Judge and counsel for the defendant, and that it was not in the mind of any one that it was intended as a

rebuttal of the defendant's testimony as to his reputation. When the cross-examination of the defendant touched the transaction with Murphy, counsel for the defendant objected, not upon the ground that the question tended to elicit proof of a particular act of violence on the part of the defendant, in rebuttal of his testimony as to his reputation for peace and good order, but that "That is a collateral matter." The response of the Circuit Judge to the objection shows that he so understood the purpose and trend of the proposed testimony:

"The Court: As I understand it, your defense is that this information that was imparted by his wife threw his mind into such a condition at the time of the alleged shooting that he was not responsible. That, as I understand it, is your defense?

"Mr. Dagnall: That is one of the defenses.

"The Court: Now, if in an effort to break down that defense, it can be shown that similar information had been imparted on other occasions—"

At this point the Circuit Judge was interrupted by counsel for the defense with the observation which shows that he, too, understood the purpose and trend of the testimony:

"Mr. Dagnall: That is merely upon the question of insanity; the Court admits it for that purpose only."

The questions as to what occurred between the defendant and Murphy were allowed, and the defendant denied that he had accused Murphy of having had improper relations with his wife. The questions were entirely proper as tending to elicit testimony, not of particular acts of violence in violation of the rule, but of facts bearing directly upon the main defense. As the Circuit Judge was in the act of saying when he was interrupted, "If, in an effort to break down that defense, it can be shown that similar information had been imparted on other occasions," necessarily the homi-

cidal furor would have been greatly reduced in intensity. During the examination of Murphy, when objection had been made to his testimony, and was being discussed, the Circuit Judge in a colloquy with counsel for the defense asked the question:

"And why isn't it responsive to your proof of good character on the part of your man?"

To which the counsel replied:

"I don't think the solicitor would claim that that is the purpose of the testimony."

The solicitor made no response.

Now, when we turn to Murphy's testimony, we find that it is inconsequential to a degree, with little or no bearing upon either the defendant's reputation for peace and good order or his suspicions or knowledge of his wife's unfaithfulness. In the first interview the defendant approached Murphy for the avowed purpose of resenting an insult to his wife which she had reported—a commendable proceeding on his part, and one which reflected rather her fidelity and indignation than otherwise. It evidently was not what the State expected— that is, to show previous knowledge of the wife's infidelity; it certainly did not tend to establish the defendant's turbulence and violence in rebuttal of his good reputation, even if that was at issue, for it shows that the defendant declined the combat which Murphy invited, by retreating when Murphy went for his gun. In the second interview Murphy was on the street at night, and heard the defendant behind him curse him, and say, "I am going to get you"; he turned towards the defendant, and when the defendant saw a knife in Murphy's hand he turned around and walked off. No mention of the defendant's wife was made at this interview, and upon the main issue for which the testimony was offered it amounted to nothing. No effort was made by the defendant to carry the threat into exe-

cution, and, even if the State had offered evidence to re-but the defendant's testimony of reputation for peace and good order, which it did not do, and that was an issue in the case, which it was not, such testimony as Murphy gave, though inadmissible, was too insignificant and of too feeble weight to justify a reversal of the verdict. The fact that Murphy applied the vilest of epithets to the defendant without the slightest show of resentment on his part could hardly be considered the details of a particular act of violence by him.

The testimony which the State sought to elicit was un-questionably of great weight upon the issue at stake—the defendant's knowledge of the incontinence of his wife; it would be a remarkable view to take that, when a man kills another, and claims that he did so under the sudden, over-mastering furor which the knowledge of his wife's in-fidelity produced, the State cannot prove that the canker was of long standing, and the furor not for that reason sudden and overmastering. If in that effort testimony not bearing upon that issue, but bearing upon another not in question, and strictly inadmissible, should fall out, it is harmless, and presents no ground for reversal.

2. As to the testimony of Dr. Young: The testi-mony of Dr. Young, objected to, was to the effect that the deceased had declared to him, while under his treatment, that he was sexually impotent. The estab-lishment of this fact, as readily may appear, would have been a crushing blow to the theory of the defendant. We do not deem it necessary to elaborate the effect of the proof of this fact upon the revolting details of the tragedy. The point at issue is whether or not, the fact having a material bearing on the case, the doctor should have been permitted to state what the deceased declared to him as to his disease which with the deceased was afflicted attacked the citadel of

that power, and both physicians testified positively that its effect was to produce impotency. But, aside from this, the jury may have given greater weight to the statement of the deceased, who was best able to give it correctly, than to the objective symptoms diagnosed by the physicans; and, if this statement should not have been received, we are inclined to think that its admission was reversible error.

It is a well-established exception to the admission of hearsay testimony that declarations of pain, physical condition, and the effects of disease are admissible as original evidence, particularly, and in some jurisdiction only, when made to an attending physician. Under these circumstances there is no motive for concealment or misrepresentation, and that which is so much desired—the truth—may confidently be expected in such declarations.

In 22 C. J., 261 it is said:

"But statements which are fairly indicative of the existence of a relevant bodily condition of the declarant, at the time of the declaration, will be received as circumstantial evidence of the existence of that condition, even though made a considerable time after the injury" citing many cases, among them *Oliver v. R. Co.,* 65 S. C. 1, 43 S. E., 307; *Welch v. Brooks,* 10 Rich., 123; *Young v. Gray,* Harp., 38.

In *Welch v. Brooks,* 10 Rich. 123, the complaints of a slave as indications of the seat and nature of the disease were held admissible upon a question of unsoundness. The Court cited in support of its conclusions *Graham v. Reid* (Ms. Dec.); *Enicks v. Stansel* (Ms. Dec.); *Young v. Gray,* Harp., 38; *Hunter v. McClintock,* Dud., 327; and the following from Greenleaf:

"So also the representations by a sick person of the nature, symptoms and effects of a malady under which he is laboring at the time are received as original evidence."

In that connection, this also from Greenleaf is quoted:

"If made to a medical attendant they are of greater weight as evidence; but if made to any other person they are not on that account rejected."

In *Hunter v. McClintock,* Dud., 327, the Court held, in an action for damages on account of the unsoundness of a slave, that his declaration as to his pains, feelings, etc., while afflicted with a disease which is the subject of a judicial decision are admissible.

In *Gosa v. Railroad Co.,* 67 S. C., 359, 45 S. E., 815, the following from *Railroad Co. v. Newell,* 104 Ind., 264, 3 N. E., 836, 54 Am. Rep., 312, is quoted with approval:

"Where it becomes important to illustrate the physical or mental condition of an individual either at the time an injury is received, or from thence to the time of inquiry as to its severity, effect and nature, we think expressions or declarations of present existing pain or malady, whether made at the time the injury is received or subsequent to it, are admissible in evidence."

In *Seeley v. Railroad Co.,* 88 Vt., 178, 92 Atl., 28, the Court says:

"The rule that such declarations are admissible whenever the bodily or mental feelings of the declarant, or the nature, symptoms, and effect of the malady from which he is then suffering, are material to be proved is too well established to justify discussion or require the citation of authority."

In *Camp v. R. Co.,* 100 S. C., 294, 84 S. E., 825, it is held that complaints of pain, after a personal injury, may be testified to by a witness who heard them. See, also, 3 Wig. Ev., § 1718.

The other exceptions are entirely devoid of merit. The charge of the Circuit Judge was full, and an exceedingly able presentation of the legal issues involved. We perceive no error therein, but, on the contrary, ground for

unqualified commendation.    The judgment of this Court is that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE GARY concurs.

MR. ACTING ASSOCIATE JUSTICE THOS. F. McDow (concurring) : I concur in the opinion of Mr. Justice Cothran. There was no testimony whatever to sustain the plea of self-defense, and very little to establish the plea of temporary insanity.    The jury took a merciful view of the testimony. The evidence of Murphy did not amount to anything one way or the other, but it was certainly competent for the purpose for which it was offered, to wit, that the appellant had accused others of improper conduct with his wife, and managed to control his feelings when it appeared that discretion was the better part of valor.

There was no seduction in this case.    Mrs. Herring says:

"One day when I was at the office Mr. Clarence Tolley wrote on a card, 'Come back.'    I came back in about half hour.    We went into a little room at the left of the office; he kissed me then, and had intercourse with me."

She was a mother, and a married woman; she did not resent the invitation, nor ask for any explanation of it, but, after going off and remaining a half hour, voluntarily returned.    This was not the conduct of a virtuous woman, and there was no seduction in the case.    To my mind the testimony is almost conclusive that Clarence Tolley, the deceased, had no sexual intercourse with Mrs. Herring.    Tolley was seriously sick (and no one knew it better than the appellant, who worked with him), according to Dr. Henry. He was sent to Baltimore two or three times, and was operated upon, and his gland and one testicle removed.    Up to the time of his death he had a running sore.    The doctor examined him after he was operated upon, and he had no venereal disease, and again after his death, and found none. The doctors also gave it as their opinion, based on their

actual knowledge from observation, and on what Tolley told Dr. Young, that he was impotent. I cannot imagine why he would have made this statement to the doctor unless it was true, and, if true, the appellant shot to death a man who had done him no wrong whatever. It would be difficult for me to write or concur in an opinion which would result in the punishment of a man for killing the seducer of his wife, his sister, or his daughter, but I am not embarrassed with any such difficulty in this case. It will be unfortunate when an unfaithful wife, to avoid the vengeance of an outraged husband, can accuse an innocent man, and by her simple and uncorroborated statement give her husband the right to kill the supposed seducer without ascertaining the fact of the guilt or innocence of the accused. This is not the law in South Carolina, and I trust it will never be. The appellant has had a fair and impartial trial. The charge of the presiding Judge was fair, free from error, and a clear and able exposition of the law applicable to the case. All of the exceptions must be overruled, and the judgment affirmed.

MR. JUSTICE WATTS (dissenting): The defendant was indicted, tried, and convicted before Judge Gary and a jury at Anderson, November, 1920, of manslaughter, and sentenced, after a motion for a new trial was refused, for the term of eight years at hard labor. Defendant appeals. Exceptions 10, 11, 12 and 19 are sustained. The conduct of defendant on other and different occasions had no relevancy to the case on trial, the killing of Tolley; the defendant put in his general reputation for peace and good order and the State could not go into particular acts of violence by the testimony of other witnesses, or detail in evidence other quarrels with other persons.

The defendant himself, after he put in evidence his character, and took the stand, could have been asked if he had not difficulties with others, but neither he nor the State

could have detailed how they came about, or how they ended. The defendant could not be cross-examined upon collateral and irrelevant matters; the evidence of Murphy was highly prejudicial to the defendant. He was allowed to contradict the defendant upon collateral matters, not pertinent to the case, to go into details of the quarrel, and to tell that he cursed the defendant as a "damn long-legged son of a ————." It threw no light on the case on trial, the killing of Tolley by defendant, and was in conflict with the decisions of this Court in cases of *State v. Dill,* 48 S. C., 249, 26 S. E., 567; *State v. Thrailkill,* 71 S. C., 136, 50 S. E., 551; *State v. Knox,* 98 S. C., 114, 82 S. E., 278; *State v. Tidwell,* 100 S. C., 250, 84 S. E., 778; *State v. McPhail,* 115 S. C., 337, 105 S. E., 640. The evidence should be directed and limited to proof of general character or reputation, not specific or particular acts of bad or good conduct. The exceptions raising this question should be sustained.

Exceptions 15 and 20 impute error in allowing the witness, Dr. Young, over objection, to testify that deceased told him, prior to the killing, that he was impotent. This was pure hearsay, and highly prejudicial. The defendant claimed that his wife had been criminally intimate with deceased, and had caught a loathsome disease from the deceased, and conveyed it to him. The doctors had the right, after waiting on the deceased, to give opinion as to the result of their diagnosis, but they could not tell what the deceased told them. It is not claimed as a part of res gestæ or as a dying declaration. The ordinary rule established by Courts is that an expert ought not to be allowed to testify as to facts outside of his own knowledge, but can give opinion on hypothetical facts. The doctor had the right in diagnosing the case to inquire and learn of his patient his previous state of health and his present state of health, and state the result of his opinion by reason of this. But he must have his conclusions formed after his ex-

amination, and from what his patient has told him, without stating what his patient said. This would be testifying to facts within his own knowledge. The exceptions raising this question should be sustained. It is unnecessary to consider the other exceptions. Judgment should be reversed, and a new trial granted.

MR. JUSTICE FRASER (concurring): With the facts of the case this Court has nothing to do. The simple question is, Has the appellant had a lawful trial? I think there was prejudicial error, and there should be a new trial.